## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| **JIMMY GROS** | **CASE NO.  6:20-CV-01076** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **COMMISSIONER OF SOCIAL SECURITY** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that Claimant's Motion to Supplement the Administrative Record (Rec. Doc. 12) be granted and that the Commissioner's decision be reversed and remanded for further administrative action.

## Administrative Proceedings

Claimant, Jimmy Gros, fully exhausted his administrative remedies before filing this action in federal court. He filed an application for disability insurance benefits and an application for Supplemental Security Income Benefits alleging disability beginning on July 13, 2018. (Rec. Doc. 11-1, p. 163-67). His applications were denied. (Rec. Doc. 11-1, p. 81; 91).  He then requested a hearing, which was held on November 13, 2019 before Administrative Law Judge Steven Rachal. (Rec. Doc. 11-1, p. 36-72). The ALJ issued a decision on December 18, 2019, concluding

that Claimant was not disabled within the meaning of the Social Security Act from the claimed disability onset date through the date of the decision. (Rec. Doc. 11-1, p. 13-29). Claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review. (Rec. Doc. 11-1, p. 17-19). Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005). Claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Claimant was born on November 12, 1970. He was 47 years old on the alleged disability onset date and 49 years old at the time of the ALJ's decision. Claimant has less than a sixth-grade education. He worked heavy manual labor for most of his adult life. Prior to sustaining a blood infection and back injury in 2018, he worked as a laborer forming, pouring, and finishing concrete. (Rec. Doc. 11-1, p. 46-52). Claimant testified at the hearing that he now lives with his son and his son's wife. Prior to his medical issues, he lived alone and was able to pay his bills. (Rec. Doc. 11-1, p. 47-48).

Claimant alleged that he has been disabled since July 13, 2018 due to a blood infection that went into his spine and other back problems resulting in surgery. The medical records in the record reveal the following pertinent history:

2

- April 23, 2018 lumbar MRI revealed broad-based spondylytic disc bulges with disc protrusions throughout the lumbar spine with multilevel central spinal canal, lateral recess and neural foraminal stenosis, as well as a central disc protrusion and extrusion at the L5-S1 level with fairly marked lateral recess and neural foraminal stenosis bilaterally; and facet osteoarthropathy throughout the lumbar spine with possibly some component of a congenitally arrowed spinal canal. (Rec. Doc. 11-1, p. 344-45).

- Claimant was admitted as unresponsive to the emergency room at Lafayette General on July 8, 2018 due to acute alcohol intoxication and respiratory failure. He had a noted history of alcohol abuse and was hospitalized in ICU for three days. (Rec. Doc. 11-1, p. 265-91).

- Claimant presented to the emergency room on July 17 and 19, 2018 with fever and body aches. He had a noted history of heavy alcohol and tobacco use. He was ultimately diagnosed with sepsis and left arm phlebitis/MRSA and was hospitalized for nearly two weeks. He was discharged with a PICC line and IV antibiotics for six weeks. (Rec. Doc. 11-1, p. 364-624).

- July 23, 2018 cervical MRI: 1) discitis osteomyelitis with nonenhancing fluid within narrowed C6-7 disc space and associated prevertebral involvement to at least C3 and T`, with small abscess on C6; 2) generalized dural enhancement compatible with meningitis/inflammatory process; 3) multi-

level degenerative disc disease with canal and foraminal stenosis. (Rec. Doc. 11-1, p. 331-33). A lumbar MRI on the same date revealed 1) meningitis/arachnoiditis with enhancement of dura and cauda equina; 2) suspect discitis-osteomyelitist at L5-S1 and possibly at L1-2; 3) prevertebral involvement extending along presacral region to the right where there is an abscess of about 18 mm, as well as epidural inflammatory tissue at L5-S1 with suspicious subcentimeter abscess; 4) straightening of normal lumbar lordosis with advanced generalized degenerative disc disease and multilevel canal/foraminal stenosis; 5) low T1 marrow signal; 6) hyperintense signal along each lower erector spinae muscle maybe related to muscle strains or nonspecific myositis. (Rec. Doc. 11-1, p. 337-38).

- October 4, 2018 cervical MRI: suspicious for osteomyelitis involving C6 vertebral body with associated vertebral body height loss with developing osteomyelitis in the C7 vertebral body. (Rec. Doc. 11-1, p. 322).

- October 8, 2018 lumbar MRI: 1) findings suggestive of progressive osteomyelitis likely at L4-5 and L5-S1 levels with possible epidural abscess posterior to the L5 vertebral body extending to involve the S1 and S2 segments; 2) broad-based spondylytic disc bulges throughout lumbar spine with fairly marked multilevel central stenosis particularly at the L4-5 and L5-

S1 levels with possibly congenitally narrowed spinal canal. (Rec. Doc. 11-1, p. 323-24).

- October 8, 2018 thoracic MRI: 1) broad-based spondylytic disc bulges throughout the thoracic spine mildly effacing the ventral thecal sac; 2) no marked vertebral compression deformities; 3) abnormal marrow signal at C6-7, incompletely visualized. (Rec. Doc. 11-1, p. 325).

- October 9, 2018 hematuria: 6.3 right lower pole renal calculus and several small right renal cysts. (Rec. Doc. 11-1, p. 327).

- Following his July 2018 hospitalization, Claimant was diagnosed in October 2018 with osteomyelitis. He left the hospital against medical advice rather than be admitted for antibiotic treatment. Claimant was adamant that he had to return to work, though the physician strongly cautioned against it. Ultimately, Claimant discharged himself against medical advice and warning of possible worsening back pain, disability, paraplegia, paralysis, and continued vertebral collapse and possible death. (Rec. Doc. 11-1, p. 614-22).

- Claimant testified at the hearing that he attempted to return to work in October 2018, but he was unable to work due to his pain and again having to be hospitalized. (Rec. Doc. 11-1, p. 50).

- Following his hospitalization, Claimant followed up with Dr. Ray Williams, who he had been seeing prior to his infection, for his neck and low back pain

and osteomyelitis. Dr. Williams's records indicate a long-standing history of neck and back pain likely resulting from years of manual labor. It was noted that he walked with a limp and at times ambulated with a cane. Physical examinations showed painful active range of motion and negative straight leg tests. In October 2018, he was referred to Dr. Okachekwu for treatment of osteomyelitis and given a prescription for a walker. (Rec. Doc. 11-1, p. 625-41).

- Claimant treated with Dr. Okachekwu for osteomyelitis from October 2018 through June 2019. He remained on antibiotics through May 2019. (Rec. Doc. 11-1, p. 672-84).

- Claimant treated with his primary care doctor, Dr. Stacey Mayeaux, for meningitis, cervical osteomyelitis and back pain throughout 2018 and in follow up to his hospitalization for MRSA sepsis. (Rec. Doc. 11-1, p. 292-320).

- In January 2019 Claimant underwent a lumbar fusion at L5-S1 with Dr. Ray Williams due to consistent osteomyelitis at L5-S1 with multilevel degenerative changes. By March 2019, he was walking daily and back to his daily activities. (Rec. Doc. 11-1, p. 708-69). He remained off work during this time. In the meantime, in September 2019, he had a sudden onset of neck pain, for which Dr. Williams performed bilateral cervical facet injections and later

referred him to Shreveport for possible surgery. (See Dr. Williams's records at Rec. Doc. 11-1, p. 793-811).

- He completed physical therapy thereafter for neck pain with little relief. He also underwent therapy during mid-2019 for De'Quervain's tenosynovitis of the left wrist. (Rec. Doc. 11-1, p. 770).

- Claimant followed up with his primary care doctor Dr. Stacey Mayeaux from January through October 2019. He had been referred to Shreveport neurosurgery. His physical examinations showed full range of motion in the lumbar and thoracic spines and bilateral negative straight leg raise test. Also notably in October 2019, he followed up after an emergency room visit for possible microadenoma pituitary tumor. (Rec. Doc. 11-1, p. 822-74).

- Dr. Williams opined on November 20, 2019 that Claimant was totally disabled from engaging in any meaningful work from August 14, 2019 through the present. (Rec. Doc. 11-1, p. 884).

The ALJ found that Claimant was not disabled because he has the residual functional capacity to perform light duty work with some restrictions, and that a significant number of qualifying jobs exist in the national economy. (Rec. Doc. 11-1, p. 20-29).

Early in these proceedings, Claimant filed a Motion for Leave to File Addition to Administrative Record in which he sought to supplement the administrative

record with February 2020 medical records from OLSC MP Neurosurgery. (Rec. Doc. 12). These records evidence that Claimant underwent cervical surgery with placement of hardware, with noted degenerative changes in the cervical spine with loss of cervical lordosis. (Rec. Doc. 12; 12-2, p. 6-24).

Claimant now seeks reversal of the Commissioner's adverse ruling as well as a supplementation of the administrative record with evidence of his February 2020 neck surgery.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id.* (citations omitted).

8

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173. A court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022. Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience. *Wren v. Sullivan*, 925 F.2d at 126.

## B.    Entitlement to Benefits

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. See 42 U.S.C. § 423(a).   See also *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019). Supplemental Security Income (SSI) provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. 42 U.S.C. § 1382(a)(1) & (2).   See also

*Smith v. Berryhill*, 139 S.Ct. at 1772. A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

## C. **Evaluation Process and Burden of Proof**

A sequential five-step inquiry is used to determine whether a claimant is disabled. The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still

do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

### D.    __The ALJ's Findings and Conclusions__

After determining that Claimant meets the insured status requirements, the ALJ determined at step one that Claimant has not engaged in substantial gainful activity since July 13, 2018. (Rec. Doc. 11-1, p. 22). This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Claimant has the following severe impairments: osteomyelitis, degenerative disc disease, and degenerative joint disease. (Rec. Doc. 11-1, p. 22). This finding is supported by substantial evidence in the record.

At step three, the ALJ found that Claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Rec. Doc. 11-1, p. 24). Claimant does not challenge this finding.

The ALJ next found that Claimant has the residual functional capacity to perform light duty work subject to certain restrictions.  (Rec. Doc. 11-1, p. 25-27). Claimant challenges this finding.

At step four, the ALJ found Claimant was unable to perform any past relevant work. Claimant does not challenge this finding.

At step five, the ALJ found that Claimant was capable of performing a number of jobs that existed in significant numbers in the national economy. (Rec. Doc. 11-1, p. 28). Claimant challenges this finding.

### E.  <u>The Allegations of Error</u>

Claimant first urges the Court to supplement the administrative record with medical records from his February 2020 neck surgery. On the merits, he alleges the ALJ erred as follows: 1) in failing to find that a 12 month period of disability had been established; and 2) in relying upon the opinion of the State Agency physician. Claimant further asserts that 3) the Appeals Council erred in failing to enroll Claimant's chosen representative and thereby denying him due process. Because Claimant's Motion to Supplement and his challenge against the Appeals Council are related, the Court shall address these issues together.

### F.  <u>Whether the Appeals Council failed to consider new evidence of Claimant's neck surgery and denied Claimant due process.</u>

Claimant argues the Appeals Council failed to recognize his present attorney, Mr. Edward Cloos as his chosen counsel at the time of his appeal. The pertinent timeline is as follows:

Claimant was represented by attorney Miles Matt at the November 2019 ALJ hearing. (Rec. Doc. 11-1, p. 36). Following the ALJ's December 2019 unfavorable decision, Claimant retained Mr. Cloos in February 2020 for the appeals process. (Rec. Doc. 11-1, p. 16). On February 7, 2020, Mr. Cloos submitted information and a Request for Review to the Appeals Council (AC) on Claimant's behalf. (Rec. Doc. 11-1, p. 15; Rec. Doc. 12-2, p. 3). On February 8, 2020, the AC sent correspondence to Mr. Matt acknowledging receipt of the Request for Review. (Rec. Doc. 11-1, p.

11). This letter advises that any new information must be sent within 25 days of the letter, and that the AC would not allow more time to send information except for very good reasons. (Rec. Doc. 11-1, p. 11).

The administrative record also contains Claimant's February 3, 2020 Appointment of Representative Form appointing Mr. Cloos. (Rec. Doc. 11-1, p. 14). On February 24, 2020, the AC sent correspondence to Mr. Cloos advising of the receipt of Claimant's notice of representation and advising that the AC would deal directly with Mr. Cloos on the claims. (Rec. Doc. 12-2, p. 5). On April 28, 2020, Mr. Cloos sent correspondence to the AC again advising of his representation and enclosing a receipt of the filing of a Request for Review, acknowledgment of appointment, and excerpts of post-hearing, February 2020 medical records from OLSC MP Neurosurgery. (Rec. Doc. 12-2, p. 1). The administrative record includes Mr. Cloos's April 28, 2020 letter and fee agreement, but it does not contain the February 2020 medical records, which Claimant now seeks to include in the administrative record. (Rec. Doc. 11-1, p. 6-24). The Appeals Council denied Claimant's appeal on June 15, 2020 in a letter sent to Claimant and Claimant's prior attorney, Mr. Matt. (Rec. Doc. 11-1, p. 5-7).

Having reviewed the evidence, the Court recognizes that some error regarding Claimant's representative occurred. The AC's February 8, 2020 letter sent to Mr. Matt and acknowledging Claimant's request for review advised that new information

14

must be sent within 25 days, or by March 4, 2020. Claimant did not undergo neck surgery until February 26, 2020, mere days before new information was due to the AC. (Rec. Doc. 11-1, p. 12-2, p. 11). Nonetheless, had the AC recognized Mr. Cloos's representation at the time he advised of such on February 7, 2020, the pertinent correspondence would have gone to Mr. Cloos, who could have quickly sent a letter or other documents to the AC regarding Claimant's surgery. Nonetheless, the Court must determine whether the AC's error was prejudicial. See *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000).

The AC must consider newly submitted evidence if it is material. New evidence is material if (1) it relates to the time period for which the disability benefits were denied; and (2) there is a reasonable probability that it would have changed the outcome of the disability determination. *Castillo v. Barnhart*, 325 F.3d 550, 551-52 (5th Cir. 2003) (per curiam); 20 C.F.R. § 404.970(a)(5). Claimant submitted excerpts of February 2020 medical records from OLSC MP Neurosurgery, evidencing that Claimant underwent cervical surgery with placement of hardware, with noted degenerative changes in the cervical spine with loss of cervical lordosis. (Rec. Doc. 12-2, p. 6-24).

Claimant's alleged disability onset date was July 13, 2018. (Rec. Doc. 11-1, p. 163). The medical records and evidence submitted for consideration concern Claimant's osteomyelitis, as well as his pre-existing history of spine issues. Record

evidence establishes that Claimant suffered from multi-level cervical bulges, that he treated with Dr. Williams for cervical issues, and that Dr. Williams had referred him for cervical surgery. Moreover, the July 2018 cervical MRI does not delineate which issues could be attributed exclusively to osteomyelitis or pre-existing degenerative problems. (Rec. Doc. 11-1, p. 331-33). The ALJ found that claimant suffered from the following severe impairments: osteomyelitis, degenerative disc disease, and degenerative joint disease of the cervical spine. (Rec. Doc. 111-1, p. 22-). Thus, the Court finds that the medical records relate to the time period for which the disability benefits were denied.

Next, the Court must determine whether there is a reasonable probability that the evidence of the neck surgery would have changed the outcome of the disability determination. As further discussed below, the ALJ found that Claimant was capable of performing light duty work, based in large part on the opinion of State medical consultant, Dr. James Crout, who did not examine Claimant and whose review did not include records of Claimant's lumbar surgery. All things considered, the Court finds that evidence of Claimant's neck surgery could reasonably have changed the disability determination. Accordingly, the AC erred in failing to timely recognize Mr. Cloos's representation and giving him and opportunity to present the new medical evidence in support of Claimant's appeal.

16

**G.    Whether the ALJ erred in failing to find at least a closed period of disability.**

Claimant challenges the ALJ's failure to find at least a closed period of disability; however, closed period cases entail a finding of improvement. One court reasoned as follows:

> [S]eeking a closed period of disability would be inconsistent with the remainder of the claimant's arguments. In cases involving closed periods of disability, the ALJ must decide when the payment of benefits should be terminated under the medical improvement standard, which requires analysis of eight factors to determine whether claimant's condition has improved to the extent that she is no longer disabled but is ready to return to the work force. *Waters v. Barnhart*, 276 F.3d 716 (5th Cir.2002). The claimant has not made that argument. She has contended at the hearing and in her brief that her condition has worsened since she first applied for benefits…Accordingly, the undersigned finds that the claimant has abandoned any claim she might have had seeking a closed period of disability benefits.

*Mahmoudi v. Comm'r of Soc. Sec. Admin.,* No. CIV.A. 13-1126, 2015 WL 339483, at *11 (W.D. La. Jan. 26, 2015). See also *Channel v. Comm'r, Soc. Sec. Admin.,* No. 2:13-CV-0292-RSP, 2015 WL 1466824, at *3 (E.D. Tex. Mar. 31, 2015) (A finding that the claimant was not disabled during any part of the relevant time indicates that the claimant's improvement, and thus a closed period of disability, is not an issue.)

In this case, Claimant has not contended that he improved from a medical standpoint. Indeed, Claimant submitted records of a post-hearing neck surgery, a position inconsistent with a closed period argument. Therefore, considering the

relevant timeframe and medical evidence, the Court finds that the ALJ did not err by failing to consider a closed period.

**H.    Whether the ALJ erred in assessing Claimant a light duty RFC.**

Claimant next challenges the ALJ's reliance upon the State agency medical consultant, Dr. James Crout, in determining that Claimant is capable of light duty work subject to certain restrictions.

Claimant's application for benefits was filed after March 17, 2017. Therefore, the ALJ's duty to weigh medical opinions is governed by 20 C.F.R. 404.1520c. Although an ALJ is no longer required to give controlling weight to a treating physician's medical opinions, the regulations state that "[w]hen a medical source provides one or more medical opinions…, we will consider those medical opinions … from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." 20 C.F.R. § 404.1520c(a). The factors to be considered are the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and any other factor which the claimant brings to the court's attention. 20 C.F.R. § 404.1520c(c)(1-5). The two most important factors are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). With regard to supportability, the regulation states that "[t]he more relevant the objective medical evidence and

supporting explanations presented by a medical source are to support his or her medical opinion(s)…, the more persuasive the medical opinions…will be." 20 C.F.R. § 404.1520c(c)(1). With regard to consistency, the regulation states that "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2). Thus, the ALJ was required to consider all the medical opinions, focusing primarily on the supportability and consistency of each opinion. The Court finds that the ALJ's finding that Dr. Crout's opinion was persuasive, while Dr. Williams's was not persuasive is improper.

The ALJ found that Claimant's complaints were not entirely consistent with the medical evidence, noting physical exams showing full range of motion and normal gait, as well as Claimant's self-reported ability to perform some daily activities. (Rec. Doc. 11-1, p. 26-27). Otherwise, the ALJ based his findings nearly entirely on the opinion of the State medical consultant, Dr. James Crout, who the ALJ found persuasive. Dr. Crout did not examine Claimant, but instead reviewed medical records only through October 2018, when the actual evidence reveals extensive treatment for much longer (at least through cervical surgery in February 2020, which the AC should have considered).

The ALJ failed to give proper consideration to the voluminous medical records evidencing Plaintiff's extensive battle with osteomyelitis superimposed on obvious pre-existing spinal conditions resulting in surgery. Indeed, the ALJ appeared to give very little consideration to the fact of Claimant's lumbar surgery at all or that Claimant was forced to walk with a prescribed cane/walker. Even Dr. Crout noted in his December 2018 report that Claimant walked with a cane and appeared very thin and sick to the field officer. (Rec. Doc. 11-1, p. 75-81). Instead, the ALJ found Claimant's treating orthopedic surgeon, Dr. Ray Williams, to be not persuasive, based on a single letter stating that Claimant is totally disabled. The ALJ ignored Dr. Williams's medical records and hospital records detailing Claimant's lengthy hospitalizations and complicated recoveries, which appear to be ongoing at least through February 2020. Accordingly, the Court finds that the ALJ erred in relying on Dr. Crout's unsubstantiated medical opinion to the exclusion of Dr. Williams' supported medical opinion.

### Conclusion and Recommendation

For the foregoing reasons, this Court recommends that Claimant's Motion to Supplement Administrative Record (Rec. Doc. 12) be GRANTED. The Court further recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to again evaluate the claimant's residual functional capacity

based on upon the evidence in the administrative record, as supplemented with the February 2020 medical records from OLSH Neurosurgery. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[1]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual

---

[1]      See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[2]

Signed in Lafayette, Louisiana, this 8th day of December, 2021.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE

---

[2]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).